J-A14016-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| SAJARVIN S. WILLIAMS | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| STEPHANIE WILLIAMS | : | No. 2528 EDA 2023 |

Appeal from the Order Entered August 28, 2023
In the Court of Common Pleas of Chester County
Civil Division at No:  2022-04810-CU

BEFORE:  LAZARUS, P.J., STABILE, J., and LANE, J.

MEMORANDUM BY STABILE, J.:          **FILED OCTOBER 16, 2024**

Appellant, Sajarvin S. Williams ("Father"), appeals *pro se* from the August 28, 2023, order, as amended, that awarded him partial physical custody and the Appellee, Stephanie Williams ("Mother"), primary physical custody of the parties' three natural sons, J.W., Be.W., and Br.W. (collectively, "the Children").[1]  After review, we affirm.

The certified record reveals that Father commenced the underlying child custody action on July 5, 2022, wherein he requested shared physical and legal custody of the Children following his divorce from Mother in April of 2022, after more than twelve years of marriage.  Mother filed an answer and counterclaim requesting primary physical and shared legal custody.  On

_____

[1] J.W. was born in June 2013; Be.W. in October 2014; and Br.W. in September 2019.

August 22, 2022, following a custody conciliation conference, an *interim* order was issued awarding Mother primary physical custody and Father partial physical custody on alternating weekends from Friday at 5:00 p.m. to Sunday at 6:00 p.m., and on alternating Wednesday evenings from 5:00 p.m. to 7:30 p.m. The *interim* order additionally awarded the parties shared legal custody. Father timely filed a request for trial.

The Honorable Allison Bell Royer presided over the trial which commenced on May 2, 2023, and continued on May 3, 2023, and August 11, 2023. The trial court aptly recounted Parents' home locations, careers, and educational backgrounds in its opinion pursuant to Pa.R.A.P. 1925(a). Most relevantly, Mother remains in the former marital home, which is a driving distance from Father's residence of approximately eight minutes. *See* Trial Court Opinion, 2/21/24, at 4-5. Father had been the assistant principal at Coatesville Area Senior High School since 2019. *Id.* at 4 (citing N.T., 5/2/23, at 85). On the first day of trial, Father "revealed that he had accepted a position as [a]ssistant [p]rincipal at Downingtown West High School for the 2023-24 school year." *Id.* (citing N.T., 5/2/23, at 85-90). Mother is a special education coordinator at the Christina School District in New Castle, Delaware, and she would be commencing her eighth year in the position in the upcoming 2023-24 school year. *Id.* (citing N.T., 5/2/23, at 149-51).

On May 17, 2023, Mother filed a petition for special relief requesting that the court order that then-three-year-old Br.W. be enrolled for a two-year

program at Holy Angels School in Newark, Delaware, which was in close proximity to her place of employment. Father filed an answer requesting that Br.W. remain at West Grove Early Care and Development Center ("West Grove Daycare") in West Grove, Pennsylvania, for the coming school year. The court consolidated these pleadings and address them on the third and final day of the custody trial.

During the trial, Father and Mother were represented by counsel and both testified. In addition, Mother presented the testimony of her father, Thomas James Lobue; her friend, Karen Jordan; the executive director of West Grove Daycare, Karin Kryak; the principal of Assumption BVM elementary school in West Grove, Pennsylvania, Danielle White, where J.W. and Be.W. had been registered for approximately the last two years and would be entering the fifth and fourth grades; and the principal of Holy Angels School, Dr. Mary Elizabeth Muir. Further, the trial court interviewed J.W. and Be.W. *in camera* and, upon agreement of the parties, outside the presence of counsel.

The trial court issued its custody order on August 27, 2023, which it amended and docketed on August 28, 2023, along with a contemporaneous written opinion.[2] The court awarded Mother primary physical custody and Father partial physical custody

---

[2] The court amended the custody order to correct the omission of Father's increased partial physical custody on weekends during the summer.

every other weekend, in keeping with the current schedule from Friday at 5:00 p.m. where Father shall pick up the Children from Mother's until drop off at school Monday morning, or Father to return the Children to Mother's at 8:00 a.m. if no school. During the summer break from school, Father's weekends shall begin on Thursday at 5:00 p.m. where Father shall pick up the Children from Mother's until he returns the Children to Mother's at 8:00 a.m. Monday morning.

Order, 8/28/23, at ¶ 2(b). The court granted Mother's request for Br.W. to be enrolled at Holy Angels School through his kindergarten year and provided that Father "must drop [Br.W.] off to Mother at 7:00 a.m. and Mother will transport to Holy Angels." *Id.* In addition, Father's partial physical custody award included overnight on alternating Wednesdays, *i.e.*, those that follow Mother's custodial weekends, from 5:00 p.m. until he returns them to school on Thursday morning or to Mother's home at 8:00 a.m. if no school. **See id.** at ¶ 2(c). Further, on the Wednesdays preceding Mother's custodial weekends, the order provided that Father "shall also have a dinner visit" from 4:30 p.m. until 7:00 p.m. **See id.**

The custody order also set forth a shared holiday schedule which evenly splits all of the holidays except for (1) Easter Sunday that "[e]very year Mother shall have 8:00 a.m. to 2:00 p.m. Father shall have 2:00 p.m. to 8:00 p.m. in odd years only;" and (2) Halloween that Mother shall have custody every year from "5:00 p.m. until following morning at school or 8:00 a.m. if no school." **Id.** at ¶ 3(d).

Finally, the order awarded shared legal custody between the parties and provided, *inter alia*, that "[i]n keeping with the prior orders and to maintain

the Children's religious ties and obligations associated with their Catholic schooling, Father shall make reasonable efforts to attend [M]ass with the Children on his weekends." *Id.* at ¶ 8.

Father, acting *pro se*, timely filed a notice of appeal and a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b). On February 21, 2024, the trial court filed a comprehensive Rule 1925(a) opinion.

In reviewing this appeal, we observe that Father's *pro se* brief, which was timely filed on March 25, 2024 ("original brief"), lacks the statement of both the scope of review and the standard of review, the statement of the questions involved, and the summary of argument required by the Pennsylvania Rules of Appellate Procedure governing the content of briefs.[3] *See* Pa.R.A.P. 2111(a)(3), (4), (6) (Brief of the Appellant). It follows that Father's original brief also does not comply with Rule 2119(a), which provides that "[t]he argument shall be divided into as many parts as there are questions to be argued[.]" Pa.R.A.P. 2119(a) (Argument). Furthermore, Father's argument does not contain citations to the record. *See* Pa.R.A.P.

_____

[3] Father filed a second appellate brief *pro se* on March 25, 2024, which addresses an alleged order disposing of cross-petitions of contempt of the subject custody order and special relief. *See* Father's Brief (Willful Contempt Order), at 3 (unpaginated). Because this *pro se* brief involves an alleged order issued after entry of the custody order at issue in this appeal, we do not consider it.

2119(c). Father's argument encompasses a series of conclusions in which he alleges that the trial court erred.

Mother, in her appellee brief, asserts that the deficiencies in Father's original brief are substantial. She advocates for dismissal of Father's appeal pursuant to Rule 2101, which permits this Court to quash or dismiss an appeal for an appellant's noncompliance with briefing requirements. **See** Mother's Brief at 7; **see also** Pa.R.A.P. 2101 (Conformance with Requirements). We decline to do so.

This Court liberally construes materials filed by a *pro se* litigant. **See Elliott-Greenleaf, P.C. v. Rothstein**, 255 A.3d 539, 542 (Pa. Super. 2021). However, we recognize that a *pro se* appellant "is not entitled to any particular advantage because he lacks legal training. . . . [A]ny layperson choosing to represent himself in a legal proceeding must, to some reasonable extent, assume the risk that his lack of expertise and legal training will prove his undoing. . . ." **Id.**; **see also C.H.L. v. W.D.L.**, 214 A.3d 1271, 1278 (Pa. Super. 2019) ("When an allegation is unsupported by any citation to the record, such that this Court is prevented from assessing the issue and determining whether error exists, the allegation is waived for purposes of appeal.") (citation and inner quotation marks omitted).

In this case, given that the trial court filed a comprehensive Rule 1925(a) opinion, we do not dismiss or quash this appeal. **See** Mother's Brief

at 8-11. Rather, we review Father's arguments to the extent they are discernible to determine whether the court erred.[4]

Father organizes the argument section of his original brief as follows:

II(a). The author of the orders;

II(b). Judge Royer's abuse of discretion in the 16 factors (opinion), which led to an unreasonable verdict (comments on ineffective counsel included);

II(c). My historically disadvantaged subgroup;

II(d). Judge Royer's abuse of discretion in the current appeal custody order, which led to an unreasonable verdict (comments on ineffective counsel included).

Father's Original Brief at 3, 6, 16, 18 (unpaginated) (cleaned up).

_____

[4] Father has filed two additional *pro se* briefs in this appeal, which are untimely. First, Father filed a reply brief on June 12, 2024, which was due on April 26, 2024. *See* Pa.R.A.P. 2113(a) and 2185(a)(2). Second, on June 24, 2024, Father filed an application for relief that constituted, in its entirety, a second appellate brief responding to the trial court's February 21, 2024 Rule 1925(a) opinion and attaching approximately ten exhibits ("second brief"). The second brief contains the same deficiencies as his original brief. Further, Father filed an application for relief on June 26, 2024, requesting that this Court not dismiss his second brief on the basis of certain exhibits that are attached but not a part of the certified record.

We grant Father's June 24, 2024 application for relief, in part, and review his second brief together with his original brief to the extent that his arguments are discernible and not otherwise waived. In addition, we grant Father's June 26, 2024 application and do not dismiss his second brief on the basis of the exhibits attached. Rather, we consider only the exhibits included in the certified record. *See Commonwealth v. Preston*, 904 A.2d 1, 6 (Pa. Super. 2006) (*en banc*) ("The law of Pennsylvania is well settled that matters which are not of record cannot be considered on appeal.") (citation omitted).

In her appellee brief, Mother asserts that Father has waived his allegations in II(a) and (c) by not raising them in the trial court. *See* Mother's Brief at 7 (citing Pa.R.A.P. 302(a) ("Issues not raised in the trial court are waived and cannot be raised for the first time on appeal.")); *see also State Farm Mutual v. Dill*, 108 A.3d 882, 885 (Pa. Super. 2015) (*en banc*) ("On appeal, we will not consider assignments of error that were not brought to the tribunal's attention at a time at which the error could have been corrected or the alleged prejudice could have been mitigated.") (citation and emphasis omitted). Here, as discussed *infra*, Father's allegations II(a) and (c) arise from the subject custody order as fashioned by the trial court and thus were unknown to Father at the time of the trial. Therefore, we conclude that they are not waived.

This Court has explained our scope and standard of review, as follows.

We review custody orders for an abuse of discretion. *See R.L. v. M.A.*, 209 A.3d 391, 395 (Pa. Super. 2019). We will not find such an abuse merely because we would have reached a different conclusion. *See id.* Rather, an abuse of discretion occurs only if the trial court overrode or misapplied the law in reaching its conclusion, or the record shows the trial court's judgment was manifestly unreasonable or the product of partiality, prejudice, bias, or ill will. *See id.*

Moreover, our scope of review is broad. *See id.* Because this Court does not make independent factual determinations, however, we must accept findings of the trial court that are supported by competent evidence of record. *See S.C.B. v. J.S.B.*, 218 A.3d 905, 913 (Pa. Super. 2019). Importantly, we defer to the trial court on matters of credibility and weight of the evidence, as the trial court viewed and assessed witnesses firsthand. *See id.* We are not, however, bound by the trial court's deductions or inferences. *See id.* "Ultimately, the test is whether

the trial court's conclusions are unreasonable as shown by the evidence of record. We may reject the conclusions of the trial court only if they involve an error of law, or are unreasonable in light of the sustainable findings of the trial court." *E.D. v. M.P.*, 33 A.3d 73, 76 (Pa. Super. 2011) (quoting *A.D. v. M.A.B.*, 989 A.2d 32, 35-36 (Pa. Super. 2010)). As this Court has held, "[i]t is not this Court's function to determine whether the trial court reached the 'right' decision; rather, we must consider whether, 'based on the evidence presented, given [*sic*] due deference to the trial court's weight and credibility determinations,' the trial court erred or abused its discretion[.]" *King v. King*, 889 A.2d 630, 632 (Pa. Super. 2005) (quoting *Hanson v. Hanson*, 878 A.2d 127, 129 (Pa. Super. 2005)).

"When a trial court orders a form of custody, the best interest of the child is paramount." *S.W.D. v. S.A.R.*, 96 A.3d 396, 400 (Pa. Super. 2014). "The best-interests standard, decided on a case-by-case basis, considers all factors which legitimately have an effect upon the child's physical, intellectual, moral and spiritual well-being." *M.J.N v. J.K.*, 169 A.3d 108, 112 (Pa. Super. 2017). To that end, the Child Custody Act sets forth sixteen factors that a court must consider before making any custody determination. *See E.B. v. D.B.*, 209 A.3d 451, 460 (Pa. Super. 2019). "It is within the trial court's purview as the finder of fact to determine which factors are most salient and critical in each particular case." *Id.* (citation omitted).

*Taylor v. Smith*, 302 A.3d 203, 206-207 (Pa. Super. 2023).

The statutory factors are as follows.

## § 5328. Factors to consider when awarding custody.

   **(a)** *Factors.* – In ordering any form of custody, the court shall determine the best interest of the child by considering all relevant factors, giving weighted consideration to those factors which affect the safety of the child, including the following:

      (1) Which party is more likely to encourage and permit frequent and continuing contact between the child and another party.

      (2) The present and past abuse committed by a party or member of the party's household, whether there is a

- 9 -

continued risk of harm to the child or an abused party and which party can better provide adequate physical safeguards and supervision of the child.

(2.1) The information set forth in section 5329.1(a)(1) and (2) (relating to consideration of child abuse and involvement with protective services).

(3) The parental duties performed by each party on behalf of the child.

(4) The need for stability and continuity in the child's education, family life and community life.

(5) The availability of extended family.

(6) The child's sibling relationships.

(7) The well-reasoned preference of the child, based on the child's maturity and judgment.

(8) The attempts of a parent to turn the child against the other parent, except in cases of domestic violence where reasonable safety measures are necessary to protect the child from harm.

(9) Which party is more likely to maintain a loving, stable, consistent and nurturing relationship with the child adequate for the child's emotional needs.

(10) Which party is more likely to attend to the daily physical, emotional, developmental, educational and special needs of the child.

(11) The proximity of the residences of the parties.

(12) Each party's availability to care for the child or ability to make appropriate child-care arrangements.

(13) The level of conflict between the parties and the willingness and ability of the parties to cooperate with one another. A party's effort to protect a child from abuse by another party is not evidence of unwillingness or inability to cooperate with that party.

(14) The history of drug or alcohol abuse of a party or member of a party's household.

(15) The mental and physical condition of a party or member of a party's household.

(16) Any other relevant factor.

23 Pa.C.S.A. § 5328(a).[5, 6]

---

[5] Our General Assembly amended 23 Pa.C.S.A. § 5328 on April 15, 2024, which became effective on August 13, 2024. As such, the amendment was not applicable to the subject proceedings.

[6] Section 5323(a) of the Child Custody Act provides:

**(a) *Types of award.*** After considering the factors set forth in section 5328 (relating to factors to consider when awarding custody), the court may award any of the following types of custody if it is in the best interest of the child:

(1) Shared physical custody.

(2) Primary physical custody.

(3) Partial physical custody.

(4) Sole physical custody.

(5) Supervised physical custody.

(6) Shared legal custody.

(7) Sole legal custody.

23 Pa.C.S.A. § 5323(a). In this case, Father requested "shared physical custody," which is defined as "The right of more than one individual to assume physical custody of the child, each having significant periods of physical custodial time with the child." ***Id.*** at § 5322. Specifically, Father requested custody on a 5-2-2-5-day basis. ***See*** N.T., 5/3/23, at 164. The court granted
*(Footnote Continued Next Page)*

- 11 -

Trial courts are required to consider "**[a]ll** of the factors listed in section 5328(a) . . . when entering a custody order." ***J.R.M. v. J.E.A.,*** 33 A.3d 647, 652 (Pa. Super. 2011) (emphasis in original); ***see also A.V. v. S.T.***, 87 A.3d 818, 823 (Pa. Super. 2014) (citation omitted) (providing that trial courts shall set forth the mandatory assessment of the Section 5328(a) best interest factors "prior to the deadline by which a litigant must file a notice of appeal"). We have explained that "there is no required amount of detail for the trial court's explanation; all that is required is that the enumerated factors are considered and that the custody decision is based on those considerations." ***A.V.***, 87 A.3d at 823 (citation omitted).

In its opinion accompanying the custody order, the trial court set forth its assessment of the statutory best interest factors. ***See*** Trial Court Opinion, 8/28/23, at 2-9. The court found inapplicable Section 5328(a)(6), (14), and (15) and weighed equally between the parties Section 5328(a)(4), (5), and (7). The court weighed in Father's favor Section 5328(a)(2.1), (11), and (16), and weighed the remaining factors in Mother's favor, although (a)(8) only slightly.

Turning to Father's allegation II(a), he asserts that Mother's counsel "authored" the subject custody order and accompanying opinion. ***See*** Original

---

Father "partial physical custody," which is defined as "The right to assume physical custody of the child for less than a majority of the time." 23 Pa.C.S.A. § 5322.

- 12 -

Brief at 3-6 (unpaginated). In support, Father contends that the order demonstrates the "bias" of Mother's counsel with respect to church attendance and the holiday schedule, set forth above. *Id.* at 4-5; *see also* Order, 8/28/23, at ¶¶ 3, 8. Specifically, Father contends that the record evidence does not demonstrate his "unwillingness to attend church," and this provision has "a negative implication on [his] dedication to God and Jesus Christ." *Id.* at 4. With respect to the holiday schedule, Father contends that Mother's counsel wrote the relevant provision "to maximize [Mother's] preferred holiday custodial times." *Id.* at 5 (cleaned up). We discern no merit to Father's allegation.[7]

In its Rule 1925(a) opinion, the trial court denied that Mother's counsel drafted the order. *See* Trial Court Opinion, 2/21/24, at 20. The court stated that it "prepares its own [c]ustody [o]rders. . . ." *Id.*; *see also A.V.*, 87 A.3d at 824 (holding that the trial court's adoption of the mother's post-trial brief, "and the court's failure to articulate an individual reasoning, undercuts the

_____

[7] To the extent that Father asserts that Mother's counsel also authored the *interim* order, this order is not on appeal. *See* Father's Original Brief at 3-6 (unpaginated). Indeed, upon entry of the subject custody order, the *interim* order was no longer in effect. Even if it was in effect, the *interim* order would be interlocutory and not appealable. *See* Pa.R.A.P. 341(b)(1) (a final order is any order that disposes of all claims and of all parties); *G.B. v. M.M.B.*, 670 A.2d 714 (Pa. Super. 1996) (*en banc*) (a custody order is final and appealable after the trial court has concluded its hearings on the matter and the resultant order resolves the pending custody claims between the parties). Therefore, we do not address this claim.

- 13 -

proper function of trial courts and deprives this Court of an independent judicial analysis, capable of appellate review.").

Here, Father presents no evidence that Mother's counsel prepared the custody order and opinion inasmuch as Mother testified that she is Roman Catholic and Father is not; the Children have received their sacraments; and the Children have missed church on "at least five" Sundays since August 26, 2022, while in Father's custody pursuant to the *interim* order. **See** N.T., 5/3/23, at 22-23, 138. Thus, rather than demonstrating "bias" by Mother's counsel, this provision demonstrates individual reasoning by the trial court which is amply supported by the testimonial evidence.

Similarly, with respect to the holiday schedule, the holidays are evenly split between the parties in the custody order except for Easter and Halloween. **See** Order, 8/28/23, at ¶ 3. The trial court explained in its Rule 1925(a) opinion that "[i]n the proposed order attached to his pre-trial statement, Father proposed that . . . 'Holidays as set forth in the parties' [*interim*] order shall remain in effect except that Father shall have custody of the [C]hildren on Easter during odd years.' (**See** Father's pre-trial statement, 11/14/22, Exhibit B, at ¶ 5)." Trial Court Opinion, 2/21/24, at 70 (cleaned up). Thus, the court reasoned that it "gave Father what he asked for. Mother received custody from 8:00 a.m. to 2:00 p.m. every year because the parties agreed that the Children should be raised Catholic. . . . For Father, who is not Catholic, taking the Children to Mass is not and has demonstrably not been a

priority for him. . . . (N.T., 5/3/23, at 137-39)." *Id.* at 70-71. With respect to Halloween, the court explained that Father did not "request any custodial time for Halloween. . . . There is no historical record of Father ever having been home on a school night to trick-or-treat with the Children." *Id.* at 72.

Our thorough review of the testimonial and documentary evidence confirms the trial court's explanation of its Easter and Halloween custody awards. Because Father did not request the holiday schedule he raises on appeal, his claims are waived. *See* Pa.R.A.P. 302(a); *see also State Farm Mutual v. Dill*, *supra*. Even if not waived, we would discern no abuse of discretion. The court's order and opinion in this regard are well-reasoned, and Father's allegation that Mother's counsel authored them is without support in the record.

The remainder of Father's allegations are related. Father asserts that the trial court's assessment of the Section 5328(a) best interest factors is not supported by the record. *See* Father's Original Brief at 6-16 (unpaginated) (II(b)). As a result, he claims that the court fashioned an "unreasonable" order by failing to award him shared physical custody. *See id.* at 18-22 (II(d)).

Initially, we recognize that Father asserts that the custody order resulted from, in part, the ineffective assistance of his trial counsel. *See* Father's Original Brief at 12, 16, 18, 22; *see also* Father's Second brief at 24-26. Father's assertion is waived for failure to provide citation to relevant legal

authority or to develop his argument in any other manner capable of review.

**See In re M.Z.T.M.W.**, 163 A.3d 462, 465-466 (Pa. Super. 2017) (citation omitted) (reiterating that a claim is waived where an appellate brief fails to provide any discussion of the claim with citation to relevant authority or fails to develop the issue in any other meaningful fashion capable of review).

Even if not waived, we would conclude that Father's assertion is without merit for the following reasons provided by the trial court in its Rule 1925(a) opinion.

> [U]nlike a criminal matter, ineffective assistance of counsel is not a basis for appellate relief in a children's custody case. The right to be represented by counsel in civil proceedings, which is accorded to all individuals, is not the same as the right to have counsel appointed. In the absence of a right to court-appointed counsel in a civil matter, there is no derivative right to the effective assistance of counsel to enforce; thus, a derivative ineffective assistance of counsel claim is not cognizable.

Trial Court Opinion, 2/21/24, at 21 (citation omitted); **see also Karch v. Karch**, 879 A.2d 1272, 1274 (Pa. Super. 2005) (citation omitted) (reiterating, "There is no right to counsel in divorce, custody, or support proceedings."); **Commonwealth v. Wideman**, 306 A.2d 894, 896 (Pa. 1973) (The right to representation by counsel in a criminal matter to be meaningful necessarily includes the right to effective representation).

Turning to Father's assertions that insufficient evidence exists to support the court's assessment of the statutory best interest factors and that the order is unreasonable, the crux of his claim is that the trial court's award is based on discrimination. **Id.** at 16-18 (II(c)). Specifically, Father alleges:

> I am a Christian, African-American, male, originally from an inner-city largely of a low socio-economic status. Historically, members of my disadvantaged subgroups have had many court rulings, civil and criminal, that were either not in our favor when going against our advantaged counterparts . . . or that were more devastating and penalizing although our advantaged counterparts may be in an identical situation.
>
> To award [M]other primary [physical] custody, who belongs to the same historically advantaged subgroups as the hearing officers and judges that we stood in front of, while [F]ather is a law-abiding citizen who has given the court no reasons to believe otherwise, is simply discrimination. **At this point, I am uncertain if this is racial discrimination, gender discrimination, or some other type of discrimination.** . . .

Father's Original Brief at 16-18 (emphasis added). After thorough review, we conclude that Father's argument is specious.

In support, he asserts that the court's findings under Section 5328(a)(4), *i.e.*, the need for stability and continuity in the child's education, family life and community life, are based on discrimination. ***See id.*** at 17-18. Father's claim fails insofar as the court weighed Section 5328(a)(4) equally between the parties. ***See*** Trial Court Opinion, 8/28/23, at 3-5. Nonetheless, Father disagrees with the following findings by the trial court related to this statutory subsection.

> Father is very involved in the Children's sports and has coached them (which Mother encourages). Mother is also quite supportive of the Children's sporting events. Mother was horrified that they had to miss the All-Star game this year because Father failed to return a day or two early from his vacation to make it happen. Father's sister had died, and he and the Children were in South and then in North Carolina with his extended family on vacation, but also post-funeral. **Father's assessment of priorities regarding the All-Star game was more understandable than Mother's.**

*Id.* at 4 (emphasis added). Based on these findings, Father alleges, "The author of the opinion was more concerned about how the advantaged appellee felt about the missed baseball game instead of how the disadvantaged appellant felt about his deceased sister. This is privilege." Father's Original Brief at 17-18. We disagree. To the contrary, the court found Father's judgment reasonable for the Children to miss the All-Star game under the circumstances. Thus, Father's claim that these findings constituted discrimination of any kind is without merit.

In his second brief, written in response to the court's Rule 1925(a) opinion, Father recites numerous factual findings and determinations of credibility and weight of the evidence by the court with which he disagrees. He alleges that the court abused its discretion due to discriminating against him on the basis of gender, religion, and race. Specifically, Father asserts, "Judge Royer used a stereotype of an angry, dangerous black man to unjustly characterize me, and I have severely suffered from the consequences." Father's Second Brief at 2 (unpaginated). We again conclude that his arguments are specious.

Simply put, Father requested shared physical custody, but the court awarded him partial physical custody. The trial court stated in its Rule 1925(a) opinion that the order increased Father's custody "from four overnights in a

twenty-eight day period to eight overnights in a twenty-eight day period."[8]

Trial Court Opinion, 2/21/24, at 10. Based on the court's sustainable findings

of fact, we conclude that Father's custody award is reasonable.

We emphasize the court's findings with respect to Section 5328(a)(9)

and (10), both of which it weighed in Mother's favor, as follows.

> The record is replete with evidence demonstrating that Mother has historically, pre-and post-separation, been the parent who is most available to the [C]hildren, emotionally as well as physically. Mother was available to her middle child when he was ill at Father's house and Father, telling the child to give him another hour, refused to be roused from his sleep, despite the child's efforts to wake him and Mother's efforts to call Father before entering his home. (N.T., 5/3/23, at 158-61.) Mother knows the name of all of the [C]hildren's teachers and medical care providers. (N.T., 5/2/23, at 168, 177-85). She has historically flexed her work hours to accommodate the [C]hildren's needs, taking them to medical and dental appointments and staying home with them when they have been sick. (*Id.* at 71-72, 152-53, 161-62; N.T., 5/3/23, at 27; [N.T.], 8/11/23, at 115-16).
>
> Father's former job as an assistant principal with the Coatesville Area School District kept him away from home for long hours during the work week. (N.T., 5/2/23, at 44, 60, 158, 188-90). Mother's job did not. (*Id.* at 152-53). Father has now taken a similar position with the Downingtown Area School District. (*Id.* at 88-89). Father suggests that his workday will be less demanding because the Downingtown Area School District does not suffer to the same extent the societal ills that plague

---

[8] Father calculates that the subject custody award provides him with 35% of overnights. *See* Father's Second Brief at 18 (unpaginated). Father states that his "previous" attorney told him "shared custody begins at 40%." *Id.* Father alleges that the trial court had the following "motive" in awarding him partial physical custody — "**to have Domestic Relations require the maximum amount of child support**. . . . Because I was married for ten years, and am a loving and involved father, **to be ordered to pay the maximum amount of child support is discrimination.**" *Id.* at 18-19 (emphasis added) (cleaned up).

Coatesville. (*Id.* at 87). Father claims that he will not have the same duties as assistant principal of Downingtown West that he did as assistant principal of Coatesville Senior High School. (*Id.* at 90-110); N.T., 8/11/23, at 181-90). At the time of the last hearing in this case, school had not yet started for Downingtown West. (N.T., 8/11/23, at 185). Father had not served as an assistant principal at Downingtown while school was in session. (N.T., 8/11/23, at 185). Father's assertion that his duties will be much lighter in his new position is speculative at best. At the time of this trial, he had not had an opportunity to experience what a typical workday at Downingtown West during the school year would be like. Although Father stated that his contract only requires him to work seven (7) hours per day, he acknowledged that it also stated that he was one of three or four other administrators/staff who would have additional duties on a rotating basis outside of the normal school hours. (N.T., 5/2/23, at 90; N.T., 8/11/23, at 186-88). There is no indication as to how often he would have to serve in this additional capacity, or whether he would have any influence as to the times or dates he would be called to serve. Mother does not have these constraints in her job. (N.T., 5/2/23, at 152-53). As we have already discussed, her job is more flexible and has always allowed her to be available to the Children when necessary. As a result, she has historically occupied the role of the "go-to" parent for the Children's extracurricular activities, both at the schools and at home, and has striven throughout the parties' relationship, but especially and most relevantly post-separation, to include Father in these activities between Father and the Children. . . .

Father alleges that the court erred in its resolution of factor number 9 because it demonstrated bias in discussing Father's focus on his career and not Mother's focus on her career. As we stated, Father's career track has been quite different from Mother's. Father is in an administrative position. Mother is not. Mother has the ability and does routinely flex her hours to be available for the Children. [(N.T., 5/3/23, at 26)]. Father historically has been unable to do that; instead, he has regularly had to work long hours, beginning at roughly 6:00 or 6:30 a.m. and continuing well into the evening, sometimes as late as 9:00 or 10:00 p.m. or later. [(N.T., 5/2/23, at 158-159, 188-190)]. We acknowledged that both parties have different focuses in their approaches to parenting and that the Children can benefit from each party's approach as they did when the marriage was intact. However, it is not bias to observe the historical arrangement

between these parties, that is, that Father would work to advance his career for the benefit of the family and Mother would assume more of the day-to-day parental duties to enable him to do so.

. . .

Trial Court Opinion, 2/21/24, at 45-47 (cleaned up). With respect to Section 5328(a)(10), the court also reasoned, in part:

At the time of this decision, as we have already noted, Father had not had the opportunity to experience what a typical day at Downingtown West would be like for an assistant principal, a position we note that Father chose to disclose to Mother **at trial**, hindering her ability to investigate Father's assertions. Resolution of this factor could change if Father's present job is in fact less demanding than his prior one. Resolution of this factor could change, as we noted in our opinion, as the Children grow. Resolution of this factor could also be impacted by a change in the way the parties approach parenting together in this chapter of their lives. However, as the evidence of record stands, at this time Mother is the party who is more likely to attend to the daily physical, emotional, developmental, educational and special needs of the Children.

*Id.* at 50 (emphasis in original) (cleaned up). The foregoing factual findings are supported by the record evidence, and we conclude that the court's custody order is reasonable given these findings.

We further recognize that the Children's *in camera* testimony supports the custody order, which the trial court, in assessing Section 5328(a)(7), weighed equally between the parties. Specifically, J.W., then age ten and entering fifth grade, testified as follows.

Q. Do you like going every other weekend [to Father's house] or would you like to do more or less?

A. I li[ke] how it is.

Q. You like it how it is. Do you think you get to see enough of your dad?

A. Yeah.

N.T., 8/11/23, at 224-225. J.W. further testified that when he sleeps at Father's home, "it's kind of hard. I just miss my mom." *Id.* at 222. Be.W., then age eight and entering fourth grade, testified as follows.

Q. Anything you would like to change about [the custody schedule]?

A. No. Mostly I like living with mom and going every other week [to Father's].

. . .

Q. Would you like to spend more nights with dad or less or same?

. . .

A. A tiny bit more with my dad.

*Id.* at 237.

We now turn more closely to Father's allegations in his second brief that the trial court's findings are imbued with racial discrimination. Father asserts that the trial court "attempted to destroy my character, claiming that I am threatening and a safety risk, implying that I am a[n] angry, dangerous black man, but there is absolutely zero evidence to support [the trial court]'s ruling and conclusion about my character." Father's Second Brief at 8-9 (unpaginated). In support, Father disputes nearly all credibility determinations made by the trial court. *See id.* at 9-13. However, this Court defers to the trial court's credibility and weight determinations. *See Taylor*

- 22 -

*v. Smith*, 302 A.3d at 207 (citation omitted).  Further, our careful review of the record and the trial court's opinions reveals a firm evidentiary basis for Father's partial physical custody award.  The record does not support Father's allegations that the order is legally erroneous based on "racial stereotype," which we deem abhorrent and has no place in the courts of this Commonwealth.

We focus on the trial court's findings regarding Father's (1) marijuana use and (2) "anger management issues."  Father's Second Brief at 2-4; *see also* Trial Court Opinion, 2/21/24, at 28-29.  Father disagrees with the court crediting the testimony of Mother's father, Mr. Lobue, that he was in the parties' home in December 2019 assisting with childcare when Br.W. was a newborn.  *See* N.T., 8/11/23, at 250.  Mr. Lobue testified, *inter alia*, that he observed Father smoking marijuana at least once.  *Id.* at 253-254.  Father asserts that the court should have discredited Mr. Lobue because he allegedly thought that "COVID-19 is a scam."  Father's Second Brief at 9.  The trial court explained that it credited Mr. Lobue's testimony "about his observations of Father smoking marijuana because they were buttressed by Mother's own testimony to having observed Father smoking marijuana on the deck at the marital residence and stuffing marijuana leaves in the basement rafters. (N.T., 5/3/23, at 40-45).  . . . Mr. Lobue's testimony . . . has no relationship to his views on the pandemic."  Trial Court Opinion, 2/21/24, at 60-61 (cleaned up).  Ultimately, this evidence was significant for the court's

assessment of Section 5328(a)(14). The court stated "[a]lthough we did not weigh it heavily against Father at this time, we did weigh this factor against Father. He is the only party on this record for whom there is evidence of substance abuse." *Id.* at 61. We discern no abuse of discretion by the court. Thus, we conclude Father's allegation that the trial court based its finding on a racial stereotype and not on the record evidence is disingenuous.

With respect to the trial court's determination that Father has "anger management issues," these findings relate to Section 2511(a)(2), the present and past abuse committed by a party or member of the party's household, whether there is a continued risk of harm to the child or an abused party and which party can better provide adequate physical safeguards and supervision of the child, and (2.1), the information set forth in section 5329.1(a)(1) and (2) (relating to consideration of child abuse and involvement with protective services). *See* 23 Pa.C.S.A. § 5328(a)(2), (2.1). The court explained:

> Mother obtained a PFA [Protection from Abuse] against Father in 2015, which she withdrew when the parties reconciled. (N.T., 5/2/23, at 7, 12; N.T., 8/11/23, at 110).[9] At some point, Children, Youth and Families [("CYF")] became involved with the parties, although the ultimate investigation into allegations that Father abused the Children resulted in a designation of "unfounded." (N.T., 5/2/23, at 19). Mother denied having been the reporting party. (N.T., 5/3/23, at 71). . . .
>
> . . .

---

9 Our review of the record confirms that Mother filed a PFA petition against Father in 2015, but not that she obtained a PFA order.

Assessment of these particular factors as they relate to child abuse and involvement in protection services yield in Father's favor, as they demonstrate that Father has not been found by [CYF] to have committed abuse against the Children. However, the factors listed in Section 5329(a)(1)-(2) are merely a component of the [best interest factor at Section] 5328(a)(2). The fact that this component yields in favor of Father does not change our determination that overall, given Father's anger issues and the poor judgment they often entail, and the fact that the record does not reflect that the Children have suffered any injuries or had untreated medical issues while in Mother's care, an analysis of the factors set forth at Section 5328(a)(2) of the Child Custody Act results in the conclusion . . . that there is in fact the continuing **risk** of harm to another party, *i.e.*, Mother, who can better ensure adequate physical safeguards and supervision of the Children. We considered the fact that Father was exonerated by [CYF] from the child abuse report made against him when we analyzed the second factor to be considered when fashioning a custody order. However, that fact does not change the circumstances of the dynamic between Father and Mother and it does not alter our conclusion that Mother provides the safest and most attentive environment for the Children.

Trial Court Opinion, 2/21/24, at 26-27, 31 (emphasis in original) (cleaned up).

The court set forth the facts supporting its determination under Section 2511(a)(2), which we recite herein.

Mother introduced pictures of her two older sons' legs, each child appearing to have sustained a bruise that Mother attributed to Father. (**See** N.T., 5/3/23, at 31-40, 96-97, Exhibits M-11, M-12). Mother introduced pictures of [Br.W.] following a period of care with Father showing what appears to be a very swollen eye. (N.T., 8/11/23, at 95-96, Exhibit M-18). The cause of the swelling was never adequately explained. Father did not take [Br.W.] for medical treatment. (N.T., 8/11/23, at 160-62). When Mother took [Br.W.] to the doctor's office on Monday morning, the doctor did not treat [Br.W.] for allergies. (N.T., 8/11/23, at 96). Father denied abusing [Br.W.] and attributed the swollen eye to allergies. (N.T., 8/11/23, at 160-62).

Mother testified as to a time when [Be.W.] was sick while in Father's custody and despite the child having tried to wake Father

[during the night] to get him to assist the child, Father did not get up. (N.T., 5/3/23, at 158-62; N.T., 8/11/23, at 126-28). Father told the child that he would have to wait for an hour. (N.T., 5/3/23, at 159). Mother came to Father's house to care for the child because Father was unresponsive. (N.T., 5/3/23, at 158-62; N.T., 8/11/23, at 126-28). She entered the house when [Be.W.] opened the door for her. (N.T., 5/3/23, at 160; N.T., 8/11/23, at 126-27). Father was incensed that she entered his home without his permission. (N.T., 5/3/23, at 160).

There was testimony that Father in anger ripped the door handle off of Mother's car on another occasion. (N.T., 5/3/23, at 64-65). Mother testified about another occasion when Father in anger kicked her car door and shattered its glass window. (N.T., 5/3/23, at 65-66).

There was testimony that Father, again in anger, put the two older children in his vehicle during a pick-up and did not use their respective safety seats. (N.T., 5/3/23, at 29-30; N.T., 8/11/23, at 257-58). There was testimony about a time when Mother was volunteering in the evening at the Children's school and Father entered the school, used profanities and caused a scene because Mother's activity was interfering with her custodial time.[10] (N.T., 5/3/23, at 45-49).

Mother testified that Father installed video cameras inside the marital residence without telling her. (N.T., 5/3/23, at 41-42).

---

[10] Specifically, Mother testified that, in April of 2022, prior to Father commencing the underlying custody action, she volunteered for one evening event at Assumption BVM, which, as best we can discern, was a school fundraiser. *See* N.T., 5/3/23, at 46-47. Mother testified that she had told Father "I'll probably be home around 9:00" p.m. *Id.* at 47. She testified that Father called her at 9:00 p.m. "on the dot," and she told him that "it's probably going to be 9:30 maybe even 10 o'clock before I get" home. *Id.* Mother stated that, "at 9:22" Father attempted to enter the school event with the Children, tried "to shoo them out of the event" because it was not for children. *Id.* at 48. Mother testified that Father, in response, cursed at the volunteer and then stated, "their mother's in here and she needs to be with them. She needs to be taking care of them." *Id.*

Trial Court Opinion, 2/21/24, at 26-28 (cleaned up).  Mother's testimony, and Mr. Lobue's with respect specifically to the Children's "safety seats," supports the court's findings set forth above.  Further, Mother's testimony confirms that the incidents happened after she withdrew the 2015 PFA petition.

Based on the foregoing, the court determined pursuant to Section 5328(a)(2) that:

> Father has anger management issues.  Mother is not without her own issues; however, there is no evidence indicating that the Children have suffered any injuries while in Mother's care, have not received medical care, or have been exposed to dangerous situations under her watch.  We are not worried that Father has deliberately harmed or may in the future deliberately harm the Children.  However, an ongoing threat of abuse is not the only component of this factor.  An assessment of the continued risk of harm to an abused party and which party is better able to provide adequate safeguards and supervision for the Children are also to be considered.
>
> The record before the court demonstrates that Father's conduct towards Mother is inappropriate and threatening.  Further, the record demonstrates that Mother has a better track record of providing adequate physical safeguards and supervision to the Children such as to ensure their safety and well-being at all times.  Consequently, we found this factor weighs in favor of primary custody to Mother.

Trial Court Opinion, 2/21/24, at 28 (cleaned up).  We discern no abuse of discretion.  Thus, Father's claim fails that the court based its findings on a racial stereotype.

Further, it is important to note that the court made one finding regarding Father's race, and the finding was in his favor.  *See* Trial Court Opinion, 8/28/23, at 9-10; Trial Court Opinion, 2/21/24, at 62-64.  In its opinion

accompanying the order, the court assessed Section 5328(a)(16), any other relevant factor, as follows.

> Neither party offered a specific request for any additional relevant factor at trial. However, in his written closing submission, Father requested that the court consider under factor #16 the fact that the Children are biracial, and that they need significant time with each parent to appropriately know their own ethnicity. Father's point is well taken, and we acknowledge that both parents and their extended families are important for the Children's identities. While we do not find Mother to be lacking in cultural sensitivity, this factor is worthy of consideration **and does favor Father's position**.

Trial Court Opinion, 8/28/23, at 9-10 (emphasis added) (cleaned up). In its Rule 1925(a) opinion, the court explained:

> Father is the best party to acquaint the Children with the African-American side of their heritage. However, the fact that one or two of the factors we considered out of the sixteen mandatory factors set forth in the Child Custody Act weigh in favor of Father does not automatically translate to the best interests of the Children being promoted by Father attaining equally shared custody at this point. . . . Father's better position to teach the Children about their African-American heritage and his close geographical proximity to the Children's residence do not outweigh the more plentiful factors weighing in favor of primary custody to Mother, particularly those factors that analyze which party is best at promoting the Children's health and safety.

Trial Court Opinion, 2/21/24, at 63 (cleaned up). We discern no abuse of discretion.

Finally, Father takes issue with his partial physical custody award to the extent that he must pick the Children up from Mother's home at 5:00 p.m. on alternating Fridays and return Br.W. to Mother's home at 7:00 a.m. on alternating Mondays and Thursdays. *See* Father's Original Brief at 19-20

(unpaginated) (citing Amended Order, 8/28/23, at ¶ 2(b)).  We discern no error or abuse of discretion.

Specifically, Father argues it is likely that J.W. and Be.W. will be home alone "for some time" prior to his pick-up at 5:00 p.m., and he prefers to pick them up from school instead.  *Id.*  This claim fails for the reasons stated by the court in its Rule 1925(a) opinion.  *See* Trial Court Opinion, 2/21/24, at 65.  Simply put by the court, and our review of the record confirms, "Father makes statements here that contradicted the sworn testimony of record. . . . Father's premise for alleging error here is fundamentally flawed because it is based on false information." *Id.* at 65 (incorporating its analysis of the record evidence in same opinion at pages 33-36).

With respect to Br.W.'s 7:00 a.m. morning drop off, Father asserts that the child instead needs to be dropped off at Mother's home at 6:45 a.m. so that he can return home prior to the arrival of J.W.'s and Be.W.'s school bus. *See* Father's Original Brief at 20.  This claim also fails for the reasons stated by the court in its Rule 1925(a) opinion.  *See* Trial Court Opinion, 2/21/24, at 66-68.  The court explained:

> There was no testimony about a bus stop in front of Father's home or that the bus, any bus, would be picking [J.W. and Be.W.] up from Father's home at 7:00 a.m.[11]  Consequently, Father's

---

[11] In fact, J.W. and Be.W. attend Assumption BVM school, "which is located just a few minutes from Father's house," and there was no testimony that they would have to take a school bus.  Trial Court Opinion, 2/21/23, at 66 (citing N.T., 5/2/23, at 38).

allegation of error is based on a flawed recollection of the evidence produced at trial.

*Id.* at 67. Upon review, Father is not entitled to relief. ***See id.*** ("Father's allegation of error may more appropriately serve as a basis for a subsequent petition for modification of custody; however, it does not support a conclusion that the order . . . based on the evidence of record . . . was the product of an abuse of discretion or error of law.").

In this case, the trial court's consideration of the Children's best interests was careful and thorough, and its conclusions were reasonable based upon its sustainable factual findings. Accordingly, we affirm the custody order.

Order affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 10/16/2024